1
2
3
4
5
6
7

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHANIE DIDINGER, | No. 2:17-CV-1320-DMC |
| Plaintiff, | |
| v. | MEMORANDUM OPINION AND ORDER |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

Plaintiff, who is proceeding with retained counsel, brings this action for judicial review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g). Pursuant to the written consent of all parties (Docs. 6 and 7), this case is before the undersigned as the presiding judge for all purposes, including entry of final judgment. See 28 U.S.C. § 636(c). Pending before the court are the parties' briefs on the merits (Docs. 11, 12, and 13).

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole. See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999). "Substantial evidence" is more than a mere scintilla, but less than a preponderance. See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 402 (1971). The record as a whole,

1   including both the evidence that supports and detracts from the Commissioner's conclusion, must

2   be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones

3   v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's

4   decision simply by isolating a specific quantum of supporting evidence.  See Hammock v.

5   Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative

6   findings, or if there is conflicting evidence supporting a particular finding, the finding of the

7   Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

8   Therefore, where the evidence is susceptible to more than one rational interpretation, one of

9   which supports the Commissioner's decision, the decision must be affirmed, see Thomas v.

10  Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

11  standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th

12  Cir. 1988).

13          For the reasons discussed below, the Commissioner's final decision is affirmed.

14

15                  **I.  THE DISABILITY EVALUATION PROCESS**

16          To achieve uniformity of decisions, the Commissioner employs a five-step

17  sequential evaluation process to determine whether a claimant is disabled.  See 20 C.F.R.

18  §§ 404.1520 (a)-(f) and 416.920(a)-(f).  The sequential evaluation proceeds as follows:

19          Step 1          Determination whether the claimant is engaged in
20                          substantial gainful activity; if so, the claimant is presumed
                            not disabled and the claim is denied;

21          Step 2          If the claimant is not engaged in substantial gainful activity,
                            determination whether the claimant has a severe
22                          impairment; if not, the claimant is presumed not disabled
                            and the claim is denied;
23
            Step 3          If the claimant has one or more severe impairments,
24                          determination whether any such severe impairment meets
                            or medically equals an impairment listed in the regulations;
25                          if the claimant has such an impairment, the claimant is
                            presumed disabled and the clam is granted;
26

27  / / /

28  / / /

                                    2

| | | |
|---|---|---|
| Step 4 | | If the claimant's impairment is not listed in the regulations, determination whether the impairment prevents the claimant from performing past work in light of the claimant's residual functional capacity; if not, the claimant is presumed not disabled and the claim is denied; |
| Step 5 | | If the impairment prevents the claimant from performing past work, determination whether, in light of the claimant's residual functional capacity, the claimant can engage in other types of substantial gainful work that exist in the national economy; if so, the claimant is not disabled and the claim is denied. |

See 20 C.F.R. §§ 404.1520 (a)-(f) and 416.920(a)-(f).

To qualify for benefits, the claimant must establish the inability to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted, or can be expected to last, a continuous period of not less than 12 months. See 42 U.S.C. § 1382c(a)(3)(A). The claimant must provide evidence of a physical or mental impairment of such severity the claimant is unable to engage in previous work and cannot, considering the claimant's age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. See Quang Van Han v. Bower, 882 F.2d 1453, 1456 (9th Cir. 1989). The claimant has the initial burden of proving the existence of a disability. See Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990).

The claimant establishes a prima facie case by showing that a physical or mental impairment prevents the claimant from engaging in previous work. See Gallant v. Heckler, 753 F.2d 1450, 1452 (9th Cir. 1984); 20 C.F.R. §§ 404.1520(f) and 416.920(f). If the claimant establishes a prima facie case, the burden then shifts to the Commissioner to show the claimant can perform other work existing in the national economy. See Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988); Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986); Hammock v. Bowen, 867 F.2d 1209, 1212-1213 (9th Cir. 1989).

/ / /

/ / /

/ / /

/ / /

3

## II. THE COMMISSIONER'S FINDINGS

Plaintiff applied for social security benefits on May 4, 2016.  <u>See</u> CAR 39.[1]  In the application, plaintiff claims disability began on May 1, 2011.  <u>See id.</u>  In her opening brief, plaintiff alleges disability arising from limitations related to lymphoma, diagnosed in 2011. Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on December 27, 2016, before Administrative Law Judge (ALJ) Jean R. Kerins.  In a February 28, 2017, decision, the ALJ concluded that plaintiff was not disabled at any time from the alleged onset date through December 31, 2016 (the date last insured) based on the following relevant findings:

1.  Through the date last insured, the claimant had the following severe impairment(s): fatigue and situational anxiety;

2.  Through the date last insured, the claimant did not have an impairment or combination of impairments that meets or medically equals an impairment listed in the regulations;

3.  Through the date last insured, the claimant had the following residual functional capacity: sedentary work; the claimant can understand, remember, and carry out simple and detailed instructions; she can maintain concentration, persistence, and pace for two hours in an eight-hour workday;

4.  Considering the claimant's age, education, work experience, residual functional capacity, and vocational expert testimony, through the date last insured the claimant could have performed her past relevant work as a graphic designer;

5.  Considering the claimant's age, education, work experience, transferability of skills, residual functional capacity, and vocational expert testimony, through the date last insured there were jobs that existed in significant numbers in the national economy that the claimant could have performed; and

6.  Considering the claimant's age, education, work experience, residual functional capacity, and Medical-Vocational Guidelines, the claimant was considered "not disabled" through the date last insured.

<u>See id.</u> at 41-61.

After the Appeals Council declined review on April 25, 2017, this appeal followed.

---

[1]    Citations are the to the Certified Administrative Record (CAR) lodged on January 16, 2018 (Doc. 10).

# III. DISCUSSION

In her opening brief, plaintiff argues: (1) at Step 4, the ALJ failed to provide clear and convincing reasons for rejecting the opinions of consultative examining physician, Robert James Spensley, M.D., who opined as to limitations which would prevent plaintiff from performing past relevant work; (2) the ALJ erred at Step 5 by relying on vocational expert testimony in response to hypothetical question which did not reflect moderate limitations in concentration, persistence, and pace; and (3) the ALJ erred further at Step 5 with respect to transferability of skills to other work.[2]

## A. **Medical Opinions**

### 1. The ALJ's Analysis

At Step 4 of the sequential evaluation process, the ALJ weighed the various medial opinions of record to determine plaintiff's residual functional capacity through the date last insured. See CAR 51-59. Specifically, the ALJ evaluated the opinions of primary care physician, Dr. Patella, testifying medical expert, Dr. Sklaroff, and consultative examining physician, Dr. Spensley. See id. The ALJ also discussed records from treating oncologists, Drs. Kohrt and Miller, but those sources appear not to have rendered opinions regarding plaintiff's functional capabilities. The ALJ rejected Dr. Sklaroff's opinion plaintiff could perform medium work. See id. at 57. As outlined above, the ALJ found instead plaintiff could only perform work at the sedentary exertional level through the date last insured. The ALJ also rejected the opinions

---

[2]    The ALJ made three independent vocational findings at Step 5, each sufficient to support the ultimate disability conclusion in the event the court finds no error with respect to the ALJ's evaluation of Dr. Spensley's opinions and residual functional capacity finding at Step 4. First, based on vocational expert testimony, the ALJ concluded plaintiff could perform her past relevant work. Second, also based on vocational expert testimony, the ALJ concluded plaintiff could perform other work due, in part, to transferability of skills from past work. Third, the ALJ concluded plaintiff was not disabled based on application of the Medical-Vocational Guidelines given plaintiff's ability to perform substantially all of the demands of sedentary work. Plaintiff does not appear to challenge the ALJ's third alternative Step 5 finding based on application of the Medical-Vocational Guidelines. Because the ALJ articulated three independently sufficient rationale supporting the vocational findings at Step 5, absent a persuasive argument relating to the Medical-Vocational Guidelines, plaintiff's arguments challenging the ALJ's vocational findings are somewhat academic because any error would be inconsequential to the ultimate disability determination. Despite the absence of any argument relating to the ALJ's third alternative vocational finding, the court will nonetheless consider plaintiff's arguments concerning the ALJ's first two alternative vocational findings, recognizing that any such discussion constitutes dictum because it does not have a bearing on the result of the case.

expressed by Dr. Patella regarding plaintiff's mental capabilities. See id. at 58-59. Plaintiff raises no claims of error with respect to the ALJ's evaluation of the opinions expressed by Drs. Sklaroff and Patella.

As to Dr. Spensley, who performed a consultative examination and rendered opinions regarding plaintiff's mental capabilities, the ALJ stated:

> . . .On January 6, 2017, Dr. Spensley interviewed the claimant who described her symptoms. She told Dr. Spensley that she is more emotional, she runs her own business but has no "oomph," and she can no longer multitask. She becomes anxious if she tries to multitask and then "is unable to do anything." She lets a lot of things go at work due to lack of energy. She described that her work has many deadlines and she has had to decrease her work schedule to one job at a time. As a result, her income decreased by 75%.
>
> The claimant told Dr. Spensley that "for a number of months" prior to diagnosis of lymphoma, she "was getting less done." She said her lymphoma "is a slow growing one, which required a lot of watchful waiting." She tries not to worry but her efforts in this regard have not been particularly successful. She expressed concern that she requires PET scans three times per year and worries the radiation will cause leukemia. She feels there is little she can do to manage the lymphoma.
>
> She told Dr. Spensley that over the past year or two she has become increasingly tired and has sleep problems as well due to chronically worrying when she is not occupied with some sort of task. She has more flexibility working at home, than if she had an 8:00 to 5:00 job and continued to allege she cannot do "anything close to what she is accustomed to." She thought she had a thyroid problem but multiple tests did not show such a problem. She also alleged she has asthma for which she occasionally uses an inhaler but tries to avoid using it if at all possible adjusting her life to minimize exposure to allergens by staying inside her house whenever allergens are present in the air and avoids pets. She exercises three times per week, which manages her physical tension, but she becomes exhausted. If she pulls a muscle while working out, she said she has significantly increased pain out of the ordinary and more difficulty recovering quickly.

CAR 53.

The ALJ then described Dr. Spensley's findings on clinical examination, which were all within normal limits. See CAR 53-54. As to the doctor's opinions, the ALJ noted:

> Functionally, Dr. Spensley opined the claimant has psychological issues of longstanding and significant tendency toward worry since childhood and that her worry periodically weighs her down. She worries a good deal at night, which significantly interferes with sleep. She has a very long history of exceedingly high job performance until some months prior to diagnosis of lymphoma in 2011. The claimant reported difficulty in managing her increasing sense of inability to handle multitasking and the

intense job pressures she handled easily and with pleasure at one time. He opined she has difficulty coping with the uncertainty of her future with lymphoma and increasingly reduced job performance due to anxiety and chronic fatigue. He opined, "There has been a major loss of control over her life." Anxiety probably increases her symptoms of fatigue and impaired concentration and memory stimulating more anxiety. Dr. Spensley opined the claimant has a 40% to 50% disability from 2011 to 2015 as measured by her decreased income. He estimated her current disability was approximately 75% based on her report that while she used to accomplish three to four jobs per day, she now completes a single job and turns down job opportunities she perceives as overly complex or that have anxiety-stimulating deadlines (8F).

* * *

. . .Dr. Spensley opined that the claimant currently had mild limitation in her ability to remember work-like procedures, understand and remember very short simple or detailed instructions. She had no limitation in her ability to carry out very short and simple instructions and mild limitation in her ability to carry out detailed instructions. She had mild to marked limitations in her ability to maintain attention and concentration for extended periods. She had no limitation in her ability to perform activities within a schedule, maintain regular attendance, be punctual within customary standards, sustain an ordinary routine without special supervision, and make simple work-related decisions. She had mild limitation in her ability to work in coordination or proximity to others without being distracted by others. She had marked limitation in her ability to complete a normal workday or workweek at a consistent pace without an unreasonable number and length of rest periods. She had no social limitations. She had mild limitation in her ability to accept instructions and respond appropriately to criticism from supervisors. She has no limitations in her ability to adapt but mild to marked limitation in her ability to travel in unfamiliar places or use public transportation. She was mildly limited in her ability to tolerate normal stress levels.

CAR 55.

Next, the ALJ detailed Dr. Spensley's opinions with respect to the 2011 to 2015 time period in particular:

. . .He opined that during this period the claimant had marked limitations in her ability to remember work-like procedures, mild limitations in her ability to understand and remember very short simple [instructions] and marked limitations in her ability to understand and remember detailed instructions. She had no limitation in her ability to carry out very short and simple instructions and mild limitation in her ability to carry out detailed instructions. She had mild to marked limitations in her ability to maintain attention and concentration for extended periods. She had no limitation in her ability to perform activities within a schedule, maintain regular attendance, be punctual within customary standards, sustain an ordinary routine without special supervision, and make simple work-related decisions. She had mild limitation in her ability to work in coordination or proximity to others without being distracted by others.

7

She had marked limitation in her ability to complete a normal workday or workweek at a consistent pace without an unreasonable number and length of rest periods. She had no social limitations. She had mild limitation in her ability to accept instructions and respond appropriately to criticism from supervisors. She has no limitations in her ability to adapt but mild to marked limitation in her ability to travel in unfamiliar places or use public transportation. She was mildly limited in her ability to tolerate normal stress levels.

* * *

. . .Dr. Spensley opined the claimant's impairment would interfere substantially with her ability to work on a regular and sustained basis at least 20% of the time. He also stated she often has periods of not leaving home for 1 to 2 weeks and works in a home office and thus satisfies that she had an anxiety disorder and partial inability to function independently outside the area of her home. She can only work one project and after two hours requires a nap (9F).

CAR 55-56.

Finally, regarding the weight afforded Dr. Spensley's opinions, the ALJ stated:

I have considered Dr. Spensley's opinion. Dr. Spensley performed a one-time evaluation of the claimant and his opinion is largely based on the claimant's subjective complaints. She said she reduced her work due to lymphoma and anxiety. He opined he was disabled 75% based on her report that her income decreased as much. This opinion has no relation to mental functional limitations. His mental status exam was unremarkable except he noticed she was anxious. Further, he opined that medications would not help her situational anxiety, but his opinion is of little evidentiary value as there has been no formal mental health treatment or medication trials. Accordingly, the undersigned assigns this opinion little weight, as it is not consistent with substantial evidence.

CAR 58.

2.      Plaintiff's Contentions

Plaintiff argues:

In a consultative examination, Dr. Robert James Spensley, M.D., completed a mental evaluation. Dr. Spensley opined that the claimant currently had mild limitation in her ability to remember work-like procedures, and understand and remember very short, simple or detailed instructions. She had no limitation in her ability to carry out very short and simple instructions, and mild limitation in her ability to carry out detailed instructions. She had mild to marked limitations in her ability to maintain attention and concentration for extended periods. She had no limitation in her ability to perform activities within a schedule, maintain regular attendance, be punctual within customary standards, sustain an ordinary routine without special supervision, and make simple work-related decisions. She had mild limitation in her ability to work in coordination or proximity to others without being distracted by others. She had marked

limitation in her ability to complete a normal workday or workweek at a consistent pace without an unreasonable number and length of rest periods. She had no social limitations. She had mild limitation in her ability to accept instructions and respond appropriately to criticism from supervisors. She has no limitations in her ability to adapt, but mild to marked limitation in her ability to travel in unfamiliar places or use public transportation. She was mildly limited in her ability to tolerate normal stress levels. R521-525. Supporting these findings was his assessment of Didinger during an interview process. The mental status examination noted that Didinger was tearful at one point. Her anxiety "was clearly present to a mild to moderate degree in the interview process." R517. Her concentration was fine in the interview process, but she appeared "somewhat exhausted at the conclusion." R517.

What is clear is that if adopted in full, Dr. Spensley's opinion would have excluded Didinger's past relevant work as a graphic designer, a highly skilled job with a specific vocational performance of 7. A marked limitation in her abilities in CPP would have precluded skilled and semi-skilled work and would have precluded her past relevant work accordingly. However, even if the marked CPP was not enough, Dr. Spensley noted that Didinger was limited to "mild limitation in her ability to carry out detailed instructions" which would have precluded Didinger's ability to perform her highly skilled past relevant work, which may have allowed her to perform semi-skilled work. Such a finding would have precluded her past work but would have potentially allowed transferable skills to come into play. However, as noted, the ALJ's findings regarding transferable skills every for semi-skilled work were flawed and unsupported by substantial evidence.

Despite Dr. Spensley's findings and the potential impact of his opinion, the ALJ gave this opinion little weight. R58. The ALJ rejected this opinion finding that the evaluation was a "one-time evaluation" and that it was "largely based on the claimant's subjective complaints." R58. The ALJ noted that the mental status examination was "unremarkable except he noticed that she was anxious." R58. This is significant given the specific findings made by Dr. Spensley that Didinger had "marked limitation in her ability to complete a normal workday or workweek at a consistent pace without an unreasonable number and length of rest periods." Those courts which have examined a finding of marked impairments of concentration, persistence or pace, have equated it to being off-task for more than 10% of the day, a work preclusive finding. *See Evans v. Astrue,* 2009 WL 4722257 *27 (N.D.W.Va.December 04, 2009) (ALJ framing hypothetical question to encompass concentration, persistence and pace rising to the level of marked and marked meaning that the claimant would be off task more than 10% of the time in an eight hour work day); *Gelser v. Astrue,* 2011 WL 832861 *17 (W.D.N.Y. 2011 January 31, 2011) (concentration, persistence, or pace refers to a disability claimant's ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings); *Stokes v. Comm'r of Soc. Sec., 2010* WL 4063886, at *11 (E.D.Mich. July 23, 2010) (court equating a marked limitation in concentration, persistence or pace with "often" suffering deficiencies in this area ); *Bankston v. Comm'r of Soc. Sec.,* 127 F.Supp.2d 820 (E.D.Mich.2000) (they determined that under the relevant portion of the PRTF, "often" should logically be defined as fifty percent of the time); *Green v. Commissioner of Social Sec.,* 2009 WL 2365557 *10 (E.D.Mich. July 28, 2009) (court considered a moderate deficiency to possible mean

drifting off task 20%-30% of the time). Regardless, even if Dr. Spensley's opinion were the basis for some weight, a basis that Didinger had even a moderate limitation in work functioning, it would have potentially precluded Didinger's past, highly skilled work.

POMS DI 25020.010, B4b and c note that the mental abilities need to do semi-skilled and skilled work involve "an increasing requirement for understanding and memory and for concentration and persistence, e.g. the ability to: Understand and remember detailed instructions; Carry out detailed instructions; and Set realistic goals or make plans independently of others" as well as noting "Other special abilities may be needed depending upon the type of work and specific functions it involves." Therefore, even if some weight or consideration was given to Dr. Spensley's opinion and corresponding limitations and given the noted requirements for skilled work such as that performed by Didinger, she would not have been able to perform such a high skilled job. As a result, she should have been found unable to perform her past relevant work.

The ALJ's finding supporting the weight given to Dr. Spensley is questionable. The Commissioner has promulgated rules regarding opinion evidence and has directed that adjudicator (ALJs) are to follow those rules. (footnote omitted). A "pecking order" has been established as to which opinions are to receive the most weight in assessing the claimant's limitations. As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source"), *Id.* § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant, but does not have an ongoing treatment relationship (a "nontreating source"), *Id.* § 404.1502, 404.1527(c)(2). In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996). Such opinions are to be weighed based on the length, frequency, nature, and extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, 20 C.F.R. § 404.1527(c)(2)-(6).

Applying these factors, the ALJ's findings do not establish clear and convincing support. While admittedly "this was a one-time evaluation," Dr. Spensley was a psychiatrist trained in such mental assessments. While there is admittedly little medical treatment for mental impairments, his opinion was consistent with the consultative examination report of Dr. Sklaroff, the medical expert retained by SSA. Dr. Sklaroff noted depression in his evaluation several times. R527-535. Moreover, the specific reasons provided by the ALJ are not supported when fully considered. The ALJ noted that the evaluation was "largely based on the claimant's subjective complaints." R58. However, this is a mental evaluation. It is impossible to provide significant objective tests to support assertions of anxiety and depression. A mental status examination is a primary tool used by psychiatrists and psychologists and it involves mostly subjective statements. (footnote omitted). The ALJ also noted that the mental status examination was "unremarkable except he noticed that she was anxious." R58. This finding is a misstatement of the record. As noted above, the mental status examination noted that Didinger was tearful at one point. Her anxiety "was clearly present to a mild to moderate degree in the interview process." R517. Her concentration was fine in the

interview process, but she appeared "somewhat exhausted at the conclusion." R517. These findings are simply deficient to reach the level of clear and convincing reasons.

### 3. Applicable Legal Standards

"The ALJ must consider all medical opinion evidence." Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527(b)). The ALJ errs by not explicitly rejecting a medical opinion. See Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014). The ALJ also errs by failing to set forth sufficient reasons for crediting one medical opinion over another. See id.

Under the regulations, only "licensed physicians and certain qualified specialists" are considered acceptable medical sources. 20 C.F.R. § 404.1513(a); see also Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012). Social workers are not considered an acceptable medical source. See Turner v. Comm'r of Soc. Sec. Admin., 613 F.3d 1217, 1223-24 (9th Cir. 2010). Nurse practitioners and physician assistants also are not acceptable medical sources. See Dale v. Colvin, 823 F.3d 941, 943 (9th Cir. 2016). Opinions from "other sources" such as nurse practitioners, physician assistants, and social workers may be discounted provided the ALJ provides reasons germane to each source for doing so. See Popa v. Berryhill, 872 F.3d 901, 906 (9th Cir. 2017), but see Revels v. Berryhill, 874 F.3d 648, 655 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(f)(1) and describing circumstance when opinions from "other sources" may be considered acceptable medical opinions).

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual, than the opinion of a non-treating professional. See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987). The least weight is given to the opinion of a non-examining professional. See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th Cir. 1990).

/ / /

In addition to considering its source, to evaluate whether the Commissioner properly rejected a medical opinion the court considers whether: (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. The Commissioner may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons supported by substantial evidence in the record. See Lester, 81 F.3d at 831. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by an examining professional's opinion which is supported by different independent clinical findings, the Commissioner may resolve the conflict. See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).

A contradicted opinion of a treating or examining professional may be rejected only for "specific and legitimate" reasons supported by substantial evidence. See Lester, 81 F.3d at 830. This test is met if the Commissioner sets out a detailed and thorough summary of the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a finding. See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989). Absent specific and legitimate reasons, the Commissioner must defer to the opinion of a treating or examining professional. See Lester, 81 F.3d at 830-31. The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional. See id. at 831. In any event, the Commissioner need not give weight to any conclusory opinion supported by minimal clinical findings. See Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion); see also Magallanes, 881 F.2d at 751.

4.      Disposition

Dr. Spensley submitted two reports, contained in the record at Exhibits 8F and 9F. See CAR 516-518 (Exhibit 8F), 519-526 (Exhibit 9F). In Exhibit 8F, a "Disability Evaluation" prepared following an examination on January 16, 2017, Dr. Spensley noted plaintiff's report her income had decreased approximately 75% due to her symptoms. See id. at 516. On mental status examination, Dr. Spensley observed normal appearance and behavior within normal limits. See id. at 517. Plaintiff's speech was normal and her emotions were "intense but restrained." Id.

12

While the doctor noted "anxiety was clearly present," he also noted it was mild to moderate and, despite this anxiety, plaintiff "seemed quite comfortable with me personally." Id. Plaintiff's thought processes were normal, her thought content was "free of distortions, delusions, ideas or reference, or depersonalizations, and there were not preoccupations." Id. Perception was normal, sensorium and intellect were normal, and "concentration was fine," although plaintiff appeared somewhat exhausted at the end of the evaluation. Id. Dr. Spensley observed no evidence of memory problems, fund of knowledge, judgment, abstraction, or insight. See id. Dr. Spensley diagnosed situational anxiety and opined plaintiff was "approximately 75%" disabled. See id. at 518. Exhibit 9F consists of a check-the-box "Mental Impairment Questionnaire" form prepared in conjunction with the doctor's January 16, 2017, evaluation. See id. at 519-526.

The ALJ gave Dr. Spensley's opinions "little weight" for the following reasons: (1) Dr. Spensley performed a one-time evaluation; (2) the doctor's opinions are "largely based on the claimant's subjective complaints"; (3) the doctor's objective findings on objective examination were ". . .unremarkable except he noticed she was anxious"; and (4) Dr. Spensley's opinion medications would not benefit plaintiff is undermined by the lack of any evidence of mental health treatment or medication trials. CAR 58. Plaintiff argues the ALJ's analysis is flawed because these reasons fail to satisfy the "clear and convincing" standard.

At the outset, the court does not agree with plaintiff the "clear and convincing" standard applies. The Commissioner must provide "clear and convincing" reasons for rejecting an uncontradicted opinion of a treating or examining medical professional. See Lester, 81 F.3d at 831. A contradicted opinion of a treating or examining professional may be rejected only for "specific and legitimate" reasons supported by substantial evidence. See id. As indicated above, Dr. Spensley's opinions are contradicted. The ALJ was required, therefore, to provide no more than "specific and legitimate" reasons for rejecting them.

The court finds the ALJ has met this standard. As the ALJ noted, Dr. Spensley's findings on objective examination were entirely unremarkable except to the extent they revealed no significant mental limitations. While Dr. Spensley noted anxiety, he opined it was mild to moderate and plaintiff nonetheless seems comfortable. Despite these objective findings, Dr.

13

Spensley reached the extreme conclusion plaintiff was 75% disabled. Coincidentally, plaintiff reported to the doctor her income had decreased approximately 75% due to her symptoms. As the ALJ noted, Dr. Spensley opined plaintiff was previously 40% to 50% disabled based on reports of concomitant income loss at the time. See CAR 55. Given the lack of objective findings to support the level of disability to which Dr. Spensley opined, the ALJ's conclusion the doctor's opinion was based largely on plaintiff's subjective report concerning her income loss is entirely reasonable and certainly a "specific and legitimate" reason to discount Dr. Spensley's opinions. See Lester, 81 F.3d at 831; Meanel, 172 F.3d 1113; Magallanes, 881 F.2d at 751.

### B. Vocational Expert Testimony

#### 1. The ALJ's Analysis

At Step 5, the ALJ concluded plaintiff could perform her past relevant work as a graphic designer. See CAR 59-60. The ALJ also found plaintiff could perform jobs which exist in significant numbers in the national economy. See id. at 60-61. In making these findings, which independently support the ALJ's ultimate disability determination, the ALJ relied on hearing testimony offered by a vocational expert. See id. at 59-61. Regarding plaintiff's ability to perform her past relevant work, the ALJ stated:

> Mr. David M. Dettmer, M.S., C.R.C., an impartial vocational expert, testified regarding the vocational aspects of this case. Upon review of the claimant's testimony and the record concerning the claimant's past work, Mr. Dettmer assessed the claimant has past work as a graphic designer (DOT 141.610-018), a sedentary exertional level skilled (SVP 7) job.
>
> I find that the jobs identified by Mr. Dettmer constitute past relevant work as the claimant performed the above stated jobs within the past 15 years at substantial gainful activity levels long enough to learn the required job skills. Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.
>
> I asked the vocational expert to assume a hypothetical person with the same age, education, work experience, and residual functional capacity as the claimant. I asked whether the hypothetical individual could perform the past relevant work of the claimant. Mr. Dettmer testified the hypothetical individual could perform her past relevant work.

/ / /

/ / /

In comparing the claimant's residual functional capacity with the physical and mental demands of this work, I find that the claimant was able to perform it as performed.

CAR59-60.

Regarding plaintiff's ability to perform other work existing in the national economy, the ALJ stated:

Although the claimant is capable of performing past relevant work, there are other jobs existing in the national economy that she is also able to perform. Therefore, I make the following alternative findings for step five of the sequential evaluation process.

The claimant was born on July 22, 1954, and was 62 years old, which is defined as an individual of advanced age, on the date last insured. The claimant was 56 years old on the alleged onset date and defined as an individual of advanced age. The claimant subsequently changed age category to closely approaching retirement age (20 CFR 404.1563). The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

The claimant has acquired work skills from past relevant work (20 CFR 404.1568). The vocational expert testified that the claimant's past relevant work as a graphic designer which was skilled with a specific vocational preparation (SVP) code of 7 and required the following skills: keyboarding, clerical, typing, and desktop publishing skills. Mr. Dettmer testified these skills are transferable to other occupations.

CAR 60.

2.    Plaintiff's Contentions

Plaintiff argues:

In this case, the ALJ provided an improper hypothetical question to the vocational expert at hearing. The hypothetical question was deficient because the ALJ erred in relation to her findings at step three and the residual functional capacity determination ("RFC").

* * *

In this case, the ALJ found, at step three, that Didinger had moderate limitations in concentration, persistence or pace ("CPP"). (footnote omitted). R50. Therefore, the ALJ was required to translate such a limitation into the hypothetical question propounded to the vocational expert. A hypothetical question posed to a vocational expert must "include all of the claimant's functional limitations, both physical and mental." *Flores v. Shalala,* 49 F.3d 562, 570 (9th Cir.1995); *Yurt v. Colvin,* 758 F.3d 850, 857 (7th Cir.2014). Such a requirement to include moderate limitations in CPP is clearly evidenced by the Commissioner's own regulations. The regulations require the hypothetical question and the residual functional capacity determination to include even non-severe;[4] with that in mind, it stands to reason that more severe "moderate"

15

limitations would also have to be factored into consideration. *Carmickle v. Comm'r, Soc. Sec. Admin.,* 533 F.3d 1155, 1164 (9th Cir. 2008). Therefore, the hypothetical question must reflect limitations derived from moderate CPP.

        The Ninth Circuit has held that an "assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with the restrictions identified in the medical testimony." *Stubbs–Danielson v. Astrue,* 539 F.3d 1169, 1174 (9th Cir.2008). The medical testimony in *Stubbs–Danielson,* however, did not establish any limitations in concentration, persistence, or pace. (footnote omitted). Therefore, the absence of any limitations in CPP was sustained. In contrast, the Ninth Circuit in an unpublished decision, overturned an ALJ's flawed hypothetical question, noting "the medical evidence establishes, as the ALJ accepted, that (the claimant) does have difficulties with concentration, persistence, or pace." *Brink v. Comm'r Soc. Sec. Admin.*, 343 F. App'x 211, 212 (9th Cir. 2009). The Court further elaborated "The hypothetical question to the vocational expert should have included not only the limitation to 'simple, repetitive work,' but also Brink's moderate limitations in concentration, persistence, or pace." *Id.* While *Stubb-Danielson* is a published decision and *Brink* is not, at least one court had noted that the "persuasive value" of *Brink* provided "instructive in regards to how it distinguished *Stubbs–Danielson." Tucker v. Colvin,* No. CV 14-08146 AG (RAO), 2015 WL 7737300, at *1–2 (C.D. Cal. Nov. 30, 2015). The *Tucker* court distinguished *Stubb-Danielson* accordingly, citing numerous other District Court decisions of a similar ilk, all of which noted that the ALJ found CPP – many of which noted that the ALJ found moderate CPP – but failed to encapsulate such limitations into the hypothetical question. (footnote omitted). In *Tucker,* the Court noted, "the ALJ accepted evidence of Plaintiff's moderate deficiencies of concentration, persistence or pace and expressly found a functional limitation resulting in failure to complete tasks in a timely manner," but the RFC only included a limitation to "perform no more than simple, repetitive tasks; perform no jobs requiring any contact with the public or more than occasional interactions with co-workers and supervisors." *Id.* at *2.

        Other courts have followed a similar path. In *Perkins v. Colvin,* 45 F. Supp. 3d 1137, 1153–55 (D. Ariz. 2014), the ALJ accepted medical expert's opinion that Plaintiff had moderate limitations in concentration, persistence, and pace. However, the hypothetical question and RFC only limited Plaintiff to jobs that required "the ability to perform simple, unskilled tasks." The Court found that the RFC was incomplete, specifically noting that it did not correspond with the ALJ's finding that Plaintiff' had moderate limitations in CPP.

        This Court has followed a similar path. In *Janovich v. Colvin*, No. 2:13-CV-0096 DAD, 2014 WL 4370673, at *5–7 (E.D. Cal. Sept. 2, 2014), noted the same as here, the ALJ found moderate limitations in CPP at step three of the sequential process. *Id.* at *6. The Court, however, noted, "The hypothetical question posed by the ALJ to the VE, however, failed to reference any limitation on the part of plaintiff concerning concentration, persistence or pace." *Id.* The Court noted that limiting a claimant to "'one to three step tasks' did not capture moderate difficulties in maintain concentration, persistence, or pace," *citing Lubin v. Commissioner of Social Sec. Admin.,* 507 Fed. Appx. 709, 712, (9th Cir.2013). *See also e.g., Yurt*, 758 F.3d at 858-59 ("We have repeatedly rejected the notion that a hypothetical…confining the claimant to simple,

16

routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, or pace."); *Young v. Barnhart*, 362 F.3d 995, 1003-04 (7th Cir. 2004) (the ALJ was held to not have accounted for limitations of concentration, persistence, and pace by restricting the inquiry to simple, routine tasks that do not require constant interactions with coworkers or the general public).

In this case, the ALJ found two limitations, both of which failed to adequately encapsulate moderate limitations in CPP. The ALJ first found that the claimant could "understand, remember, and carry out simple and detailed instructions." This finding is problematic in two ways. First, by including both simple and detailed instructions, the ALJ provided no real limitation. You may only have simple or detailed instructions. There are no other limitations noted in the Dictionary of Occupational Titles. *See Dictionary of Occupational Titles*, APPENDIX C - COMPONENTS OF THE DEFINITION TRAILER, 1991 WL 688702. Regardless, this set of restrictions is no different than "simple, routine" or "unskilled" as all of them deal with the first broad area of consideration, understanding or memory (footnote omitted) or the specific vocational preparation ("SVP"). *See Varga,* 794 F.3d at 814 ("These terms (simple, routine) refer to 'unskilled work,' which the regulations define as work that can be learned by demonstration in less than 30 days. *See* 20 C.F.R. §§ 404.1520. As *Varga* notes, whether work can be learned in this manner is unrelated to the question of whether an individual with mental impairments—*e.g.,* with difficulties maintaining concentration, persistence, or pace—can perform such work. For this reason, we have repeatedly rejected the notion that a hypothetical like the one here "confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace," *citing Yurt,* 758 F.3d at 858-59). Accordingly, the first limitation is not even a limitation and, even if it was, it did not address CPP.

The second limitation, while it directly references concentration and pace, also is not a real limitation. All work, even the most simple, uncomplicated work, involves being able to maintain concentration and pace for two-hour segments. (footnote omitted). SSA POMS DI 25020.010 Mental Limitations provides guidance noting that unskilled work involves "maintain(ing) attention for extended periods of 2-hour segments (concentration is not critical)." (footnote omitted). The ALJ did not limit Didinger to moderate limitations in that ability, nor did she find that Didinger could perform mild limitations in that ability. The hypothetical question simply indicated that she could perform that function with no limitation. The ALJ limited the client to only full-time work involving eight-hours per day, forty-hours per week, which is the finding associated with all sustained work. SSR 96-8p. Accordingly, the ALJ's finding that Didinger was limited to maintaining concentration and pace for two-hour segments also failed to account for the moderate limitations in CPP.

Accordingly, the ALJ made inconsistent findings. She found that Didinger had moderate limitations in CPP, but failed to provide any limitations which addressed CPP or which involved any actual limitation. (footnote omitted).

/ / /

/ / /

17

1          3.      <u>Applicable Legal Standards</u>

2          The Medical-Vocational Guidelines (Grids) provide a uniform conclusion about

3   disability for various combinations of age, education, previous work experience, and residual

4   functional capacity.  The Grids allow the Commissioner to streamline the administrative process

5   and encourage uniform treatment of claims based on the number of jobs in the national economy

6   for any given category of residual functioning capacity.  See <u>Heckler v. Campbell,</u> 461 U.S. 458,

7   460-62 (1983) (discussing creation and purpose of the Grids).

8          The Commissioner may apply the Grids in lieu of taking the testimony of a

9   vocational expert only when the Grids accurately and completely describe the claimant's abilities

10  and limitations.  <u>See</u> <u>Jones v. Heckler,</u> 760 F.2d 993, 998 (9th Cir. 1985); <u>see</u> <u>also</u> <u>Heckler v.</u>

11  <u>Campbell,</u> 461 U.S. 458, 462 n.5 (1983).  Thus, the Commissioner generally may not rely on the

12  Grids if a claimant suffers from non-exertional limitations because the Grids are based on

13  exertional strength factors only.[3]  <u>See</u> 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(b).

14  "If a claimant has an impairment that limits his or her ability to work without directly affecting

15  his or her strength, the claimant is said to have non-exertional . . . limitations that are not covered

16  by the Grids."  <u>Penny v. Sullivan,</u> 2 F.3d 953, 958 (9th Cir. 1993) (citing 20 C.F.R., Part 404,

17  Subpart P, Appendix 2, § 200.00(d), (e)).  The Commissioner may, however, rely on the Grids

18  even when a claimant has combined exertional and non-exertional limitations, if non-exertional

19  / / /

20  _____

21          [3]      Exertional capabilities are the primary strength activities of sitting, standing,
    walking, lifting, carrying, pushing, or pulling and are generally defined in terms of ability to
    perform sedentary, light, medium, heavy, or very heavy work.  <u>See</u> 20 C.F.R., Part 404, Subpart
22  P, Appendix 2, § 200.00(a).  "Sedentary work" involves lifting no more than 10 pounds at a time
    and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  <u>See</u> 20
23  C.F.R. §§ 404.1567(a) and 416.967(a).  "Light work" involves lifting no more than 20 pounds at
    a time with frequent lifting or carrying of objects weighing up to 10 pounds.  <u>See</u> 20 C.F.R. §§
24  404.1567(b) and 416.967(b).  "Medium work" involves lifting no more than 50 pounds at a time
    with frequent lifting or carrying of objects weighing up to 25 pounds.  <u>See</u> 20 C.F.R. §§
25  404.1567(c) and 416.967(c).  "Heavy work" involves lifting no more than 100 pounds at a time
    with frequent lifting or carrying of objects weighing up to 50 pounds.  <u>See</u> 20 C.F.R. §§
26  404.1567(d) and 416.967(d).  "Very heavy work" involves lifting objects weighing more than 100
    pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.  <u>See</u> 20
27  C.F.R. §§ 404.1567(e) and 416.967(e).  Non-exertional activities include mental, sensory,
    postural, manipulative, and environmental matters which do not directly affect the primary
28  strength activities.  <u>See</u> 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(e).

limitations do not impact the claimant's exertional capabilities.  See Bates v. Sullivan, 894 F.2d 1059, 1063 (9th Cir. 1990); Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988).

In cases where the Grids are not fully applicable, the ALJ may meet his burden under step five of the sequential analysis by propounding to a vocational expert hypothetical questions based on medical assumptions, supported by substantial evidence, that reflect all the plaintiff's limitations.  See Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995).  Specifically, where the Medical-Vocational Guidelines are inapplicable because the plaintiff has sufficient non-exertional limitations, the ALJ is required to obtain vocational expert testimony.  See Burkhart v. Bowen, 587 F.2d 1335, 1341 (9th Cir. 1988).

Hypothetical questions posed to a vocational expert must set out all the substantial, supported limitations and restrictions of the particular claimant (residual functional capacity).  See Magallanes v. Bowen, 881 F.2d 747, 756 (9th Cir. 1989).  If a hypothetical does not accurately reflect the claimant's residual functional capacity, the expert's testimony as to jobs in the national economy the claimant can perform has no evidentiary value.  See DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  While the ALJ may pose to the expert a range of hypothetical questions based on alternate interpretations of the evidence, the hypothetical that ultimately serves as the basis for the ALJ's determination must be supported by substantial evidence in the record as a whole.  See Embrey v. Bowen, 849 F.2d 418, 422-23 (9th Cir. 1988).

Residual functional capacity is what a person "can still do despite [the individual's] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a) (2003); see also Valencia v. Heckler, 751 F.2d 1082, 1085 (9th Cir. 1985) (residual functional capacity reflects current "physical and mental capabilities").  Thus, residual functional capacity describes a person's exertional capabilities in light of his or her limitations.

In determining residual functional capacity, the ALJ must assess what the plaintiff can still do in light of both physical and mental limitations.  See 20 C.F.R. §§ 404.1545(a), 416.945(a) (2003); see also Valencia v. Heckler, 751 F.2d 1082, 1085 (9th Cir. 1985) (residual functional capacity reflects current "physical and mental capabilities").  Where there is a colorable claim of mental impairment, the regulations require the ALJ to follow a special

19

procedure.  <u>See</u> 20 C.F.R. §§ 404.1520a(a), 416.920a(a).  The ALJ is required to record pertinent findings and rate the degree of functional loss.  <u>See</u> 20 C.F.R. §§ 404.1520a(b), 416.920a(b).

4.    <u>Disposition</u>

At Step 4, the ALJ concluded plaintiff could "maintain concentration and pace for two hours in an eight-hour workday."  <u>See</u> CAR 51.  These limitations to plaintiff's residual functional capacity at Step 4 arose from the ALJ's finding at Step 2 and Step 3 plaintiff had moderate limitations with respect to concentrating, persisting, or maintaining pace due to anxiety and fatigue.  <u>See</u> <u>id.</u> at 50.  Plaintiff argues the ALJ's hypothetical questions to the vocational expert failed to capture this limitation.

The court does not agree.  At the hearing, the following exchange occurred between the ALJ and the vocational expert:

> Q:    Okay.  So if I were to – let's say the limitations are that the individual could – is limited to sedentary work and could understand, remember and carry out simple and detailed instructions and could otherwise maintain concentration, persistence and pace for two hours at a time throughout the eight-hour workday, would such an individual be able to perform the past work?
>
> A:    Well, an eight-hour workday and in the standard employment is two-hour segments, so nothing precludes that if they're able to keep persistence and pace for two hours at a time.
>
> Q:    How about her past work, could she do that?
>
> A:    Well, well, certainly, if she's able to do it for two hours at a time.
>
> Q:    And I'm limiting it to simple and detailed –
>
> A:    Right.
>
> Q:    -- and not complex.  I guess I should have said that.
>
> A:    You said instructions?
>
> Q:    Yes.
>
> A:    I still don't see it precluded.

CAR 91.

/ / /

/ / /

According to plaintiff: "The hypothetical question simply indicated that she could perform that function [concentration and pace] with no limitation." This is patently false. Given the testimony above, it is obvious the ALJ precisely captured the residual functional capacity finding plaintiff could maintain concentration and pace for two hours in an eight-hour workday.

The ALJ also found at Step 4 plaintiff could "understand, remember, and carry out simple and detailed instructions." CAR 51. Plaintiff contends this limitation fails to capture the ALJ's finding at Step 2 and Step 3 plaintiff had moderate limitations with respect to concentrating, persisting, or maintaining pace. This argument is unpersuasive. As plaintiff acknowledges, "an assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with the restrictions identified in the medical testimony." Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1174 (9th Cir.2008). In this case, the medical evidence indicates plaintiff could, as the ALJ described, understand, remember, and carry out both simple and detailed instructions, and could maintain concentration, persistence, or pace to do so for two-hour increments. Notable in this regard are plaintiff's statements to Dr. Spensley, discussed above, indicating her increasing difficulty in her past work keeping up with the number of different projects for which plaintiff was responsible, not in accomplishing each individual project. Also notable is the absence of any objective findings noted by Dr. Spensley to suggest difficulty understanding, remembering, and carrying out even detailed instructions, and plaintiff has pointed to no such evidence in the record. Thus, the court concludes the ALJ's assessment and hypothetical questions posed to the vocational expert captured the restrictions in concentration, persistence, and pace indicated by the evidence.[4]

/ / /

/ / /

/ / /

_____

[4]     This conclusion is supported by plaintiff's reference to the Ninth Circuit's unpublished decision in Brink v. Comm'r Soc. Sec. Admin., 343 F. App'x 211, 212 (9th Cir. 2009), in which the court noted "[t]he hypothetical question to the vocational expert should have included not only the limitation to 'simple, repetitive work,' but also Brink's moderate limitations in concentration, persistence, or pace," thus indicating a distinction between imitations on the complexity of tasks one can perform and limitations on concentration, persistence, and pace one has while performing tasks.

C.      **Transferability of Skills**

        1.      The ALJ's Analysis

As a first alternative to the ALJ's Step 5 conclusion plaintiff can perform her past relevant work, and again relying on vocational testimony, the ALJ also found plaintiff can perform other work which exists in significant numbers in the national economy. See CAR 60-61. In making this finding, the ALJ determined plaintiff has acquired skills transferable to other work. See id. at 60. The ALJ made a second alternative finding sufficient to support the ALJ's ultimate disability determination that, pursuant to the Grids, plaintiff was not disabled through the date last insured given her ability to perform unskilled work at the sedentary exertional level, see id. at 60-61, but plaintiff does not challenge the ALJ's analysis in this regard.

Regarding transferability of skills, the ALJ stated:

> The claimant has acquired work skills from past relevant work (20 CFR 404.1568). The vocational expert testified that the claimant's past relevant work as a graphic designer which was skilled with a specific vocational preparation (SVP) code of 7 and required the following skills: keyboarding, clerical, typing, and desktop publishing skills. Mr. Dettmer [the vocational expert] testified these skills are transferable to other occupations.
>
> In the alternative, considering the claimant's age, education, work experience, and residual functional capacity, the claimant had also acquired work skills from past relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy (citations to the Code of Federal Regulations omitted).

CAR 60.

        2.      Plaintiff's Contentions

Plaintiff argues:

> First, as noted, the ALJ found that Didinger had transferable skills which would have translated into the ability to perform a wide range of other semi-skilled or skilled work. Such a finding was erroneous since Didinger would have been limited to unskilled work by the consultative examiner's opinion and as such, skills do not transfer to unskilled work as a matter of law. *Terry,* 903 F.2d at 1277 ("Skills are not transferable to unskilled work because, by definition, unskilled work requires *no* skills."). Because there would have been no transferable skills, Didinger should have met Rule 202.06 and been found disabled.
>
> Second, as noted, even if there were transferable skills – Didinger could still do semi-skilled work -- the ALJ erred in their handling of issue of skills and transferability of skills. If Didinger were even limited to semi-skilled work – the mild limitations to detailed instructions – she

would still be unable to perform her past relevant work and the ALJ's findings at step five would have been flawed. The ALJ failed to evaluate Didinger's skills in light of regulations for transferability to people of advanced age, thus meriting remand. While the ALJ found that Didinger had transferable skills, the ALJ's questioning of the vocational expert was flawed and the vocational testimony was flawed. Special rules apply to individuals in the advanced age category, which Didinger was in during the relevant time. The regulations provide the following special rules governing transferability of skills for such individuals:

> *Person of advanced age.* We consider that at advanced age (55 or older) significantly affects a person's ability to adjust to other work. We have special rules for persons of advanced age and for persons in this category who are closely approaching retirement age (age 60–64). *See* §404.1568(d)(4) [§416.968(d)(4)].

> 20 C.F.R §§404.1563(e) and 416.963(e) (2006). 20 C.F.R. §§404.1568 and 416.968 by adding a new paragraph (d)(4) which now provides, in relevant part, as follows:

> (d)    *Skills that can be used in other work (transferability).* * * *

> (4)    Transferability of skills for individuals of advanced age. If you are of advanced age (**age 55 or older),** and you have a severe impairment(s) that limits you to **sedentary or light work,** we will find that you cannot make an adjustment to other work unless you have skills that you can transfer to other skilled or semi-skilled work (or you have recently completed education which provides for direct entry into skilled work) that you can do despite your impairment(s). We will decide if you have transferable skills as follows. If you are of advanced age and you have a severe impairment(s) that limits you to no more than sedentary work, we will find that you have skills that are transferable to skilled or semi-skilled sedentary work only if the sedentary work is so similar to your previous work that you would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry. (*See* §404.1567(a) and §201.00(f) of appendix 2.) **If you are of advanced age but have not attained age 60,** and you have a severe impairment(s) that limits you to no more than **light work**, we will apply the rules in paragraphs (d)(1) through (d)(3) of this section to decide if you have skills that are transferable to **skilled or semi-skilled light work** (*see* §404.1567(b)). If you are closely approaching retirement age (**age 60-64**) and you have a severe impairment(s) that limits you to **no more than light work**, we will find that you have skills that are transferable to skilled or semi-skilled light work **only if the light work is so similar to your previous work that you would need to make very little, if any, vocational adjustment in terms of tools, work processes, work**

23

**settings, or the industry**. (*See* §404.1567(b) and Rule 202.00(f) of appendix 2 to this subpart.)

20 C.F.R §§404.1568(d)(4) and 416.968(d)(4) (2006) (emphasis added).

The immediately foregoing revisions to the regulations clarify the agency's original intent that the provisions of pre-April 6, 2000 §§404.1563(d) and 416.963(d) are consistent with, and must be read in the context of, the provisions of §§201.00(f) and 202.00(f) of Appendix 2. 20 C.F.R. §404, Subpart P, Appendix 2, §201.00(f) provides "In order to find transferability of skills to skilled sedentary work for individuals who are of advanced age (55 and over), there must be very little, if any, vocational adjustment required in terms of tools, work processes, work settings, or the industry." The ALJ never made any inquiry about this point, nor where they findings made regarding it.

Finally, SSR 82-41 repeats the rule as follows:

> *Special provisions made for transferability.* To find that an individual who is age 55 or over and is limited to sedentary work exertion has skills transferable to sedentary occupations, there must be very little, if any, vocational adjustment required in terms of tools, work processes, work settings or the industry.

SSR 82-41. . . . SSR 82-41 further explains that:

> Individuals with these adverse vocational profiles cannot be expected to make a vocational adjustment to substantial changes in work simply because skilled or semi-skilled jobs can be identified which have some degree of skill similarity with their PRW. In order to establish transferability of skills for such individuals, the semi-skilled or skilled job duties of their past work must be so closely related to other jobs which they can perform that they could be expected to perform these other identified jobs at a high degree of proficiency with a minimal amount of job orientation.

SSR 82-41. . . . To use this special "advanced age" rule of transferability, the following steps apply:

> 1.    Identify the claimant's past-relevant work.
> 2.    Using the "**Work Field**" technique of transferability described earlier identify the tools, work processes (method verbs) work setting, and the industry applicable to each of the claimant's past relevant jobs and to the occupation or occupations to which the VE testifies the claimant can transfer skills.
> 3.    Determine first whether the tools, work processes, work setting, or the industry of each of the claimant's past relevant jobs are the same as or similar to these same elements of the occupations the VE identifies. If they are not, it should be obvious that the transferability standard is not satisfied. If they are, then ask the VE to

/ / /

24

describe the degree of vocational adjustment required in terms of:

- Tools,
- Work processes,
- Work settings, or
- The industry.

Neither the ALJ nor the vocational expert apply any of these rule and regulations to this case. This is required by the regulations for someone of Didinger's age. Therefore, the ALJ's finding that Didinger had transferable skills and could readily perform other work as an alternative finding at step five is simply unsupported.

3.      Disposition

Plaintiff's argument is unpersuasive because the vocational expert's testimony itself constitutes substantial evidence to support the ALJ's vocational finding regarding transferability of skills. See Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005) ("A [vocational expert's] recognized expertise provides the necessary foundation for his or her testimony"). The court presumes the vocational expert brought his expertise and knowledge of the regulations and rulings cited by plaintiff to bear in testifying plaintiff had transferable skills. The ALJ was also entitled to so presume in relying on the vocational expert's testimony.

Even if the court were to find the ALJ erred, any error is harmless. The Ninth Circuit has applied harmless error analysis in social security cases in a number of contexts. For example, in Stout v. Commissioner of Social Security, 454 F.3d 1050 (9th Cir. 2006), the court stated that the ALJ's failure to consider uncontradicted lay witness testimony could only be considered harmless ". . . if no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." Id. at 1056; see also Robbins v. Social Security Administration, 466 F.3d 880, 885 (9th Cir. 2006) (citing Stout, 454 F.3d at 1056). Similarly, in Batson v. Commissioner of Social Security, 359 F.3d 1190 (9th Cir. 2004), the court applied harmless error analysis to the ALJ's failure to properly credit the claimant's testimony. Specifically, the court held:

However, in light of all the other reasons given by the ALJ for Batson's lack of credibility and his residual functional capacity, and in light of the objective medical evidence on which the ALJ relied there was substantial evidence supporting the ALJ's decision. Any error the ALJ may have committed in assuming that Batson was sitting while watching television,

25

to the extent that this bore on an assessment of ability to work, was in our view harmless and does not negate the validity of the ALJ's ultimate conclusion that Batson's testimony was not credible.

Id. at 1197 (citing Curry v. Sullivan, 925 F.2d 1127, 1131 (9th Cir. 1990)). In Curry, the Ninth Circuit applied the harmless error rule to the ALJ's error with respect to the claimant's age and education. The Ninth Circuit also considered harmless error in the context of the ALJ's failure to provide legally sufficient reasons supported by the record for rejecting a medical opinion. See Widmark v. Barnhart, 454 F.3d 1063, 1069 n.4 (9th Cir. 2006).

The harmless error standard was applied in Carmickle v. Commissioner, 533 F.3d 1155 (9th Cir. 2008), to the ALJ's analysis of a claimant's credibility. Citing Batson, the court stated: "Because we conclude that . . . the ALJ's reasons supporting his adverse credibility finding are invalid, we must determine whether the ALJ's reliance on such reasons was harmless error." See id. at 1162. The court articulated the difference between harmless error standards set forth in Stout and Batson as follows:

> . . . [T]he relevant inquiry [under the Batson standard] is not whether the ALJ would have made a different decision absent any error. . . it is whether the ALJ's decision remains legally valid, despite such error. In Batson, we concluded that the ALJ erred in relying on one of several reasons in support of an adverse credibility determination, but that such error did not affect the ALJ's decision, and therefore was harmless, because the ALJ's remaining reasons *and ultimate credibility determination* were adequately supported by substantial evidence in the record. We never considered what the ALJ would do if directed to reassess credibility on remand – we focused on whether the error impacted the *validity* of the ALJ's decision. Likewise, in Stout, after surveying our precedent applying harmless error on social security cases, we concluded that "in each case, the ALJ's error . . . was inconsequential to the *ultimate nondisability determination*."

> Our specific holding in Stout does require the court to consider whether the ALJ would have made a different decision, but significantly, in that case the ALJ failed to provide *any reasons* for rejecting the evidence at issue. There was simply nothing in the record for the court to review to determine whether the ALJ's decision was adequately supported.

Carmickle, 533 F.3d at 1162-63 (emphasis in original; citations omitted).

Thus, where the ALJ's errs in not providing any reasons supporting a particular determination (i.e., by failing to consider lay witness testimony), the Stout standard applies and the error is harmless if no reasonable ALJ could have reached a different conclusion had the error not occurred. Otherwise, where the ALJ provides analysis but some part of that analysis is

26

flawed (i.e., some but not all of the reasons given for rejecting a claimant's credibility are either legally insufficient or unsupported by the record), the <u>Batson</u> standard applies and any error is harmless if it is inconsequential to the ultimate decision because the ALJ's disability determination nonetheless remains valid.

In this case, the ALJ provided three legally sufficient vocational findings, two of which relied on vocational expert testimony and one of which did not because it was based on application of the Grids. Plaintiff does not challenge the ALJ's Grids analysis. Therefore, because the ALJ provided an alternative analysis that was not based on vocational expert testimony, any error with respect to reliance on vocational expert testimony is inconsequential to the ultimate result and, for this reason, is harmless. <u>See Batson</u>, 359 F.3d at 1197.

## IV. CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis. Accordingly, IT IS HEREBY ORDERED that:

    1.    Plaintiff's motion for summary judgment (Doc. 11) is denied;

    2.    Defendant's motion for summary judgment (Doc. 12) is granted;

    3.    The Commissioner's final decision is affirmed; and

    4.    The Clerk of the Court is directed to enter judgment and close this file.

Dated: January 4, 2019

DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE